UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

Nº 06-CV-4941 (JFB) (MLO)
_____

DOROTHY A. WENDEL, INDIVIDUALLY AND AS A CLASS REPRESENTATIVE FOR ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

VERSUS

STATE OF NEW YORK, NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES, AND NANCY A. NAPLES, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE DEPARTMENT OF MOTOR VEHICLES,

Defendants.

_____

MEMORANDUM AND ORDER
July 23, 2008

_____

JOSEPH F. BIANCO, District Judge:

On September 12, 2006, plaintiff Dorothy A. Wendel, individually and as a class representative for all others similarly situated ("Wendel" or "plaintiff"), brought the instant action against defendants State of New York ("New York"), New York State Department of Motor Vehicles (the "DMV"), and Nancy A. Naples, in her official capacity as Commissioner of the Department of Motor Vehicles (collectively, "defendants"). Specifically, pursuant to the Americans With Disabilities Act, 42 U.S.C. §§ 12131 and 12132 (the "ADA"), Wendel mounted a facial challenge to Section 404-a of the New York Vehicle and Traffic Law ("Section 404-a") – a New York statute that establishes the procedure by which disabled individuals, such as plaintiff, may obtain special license plates.

In particular, Wendel challenged the provision of Section 404-a that limits the disabled to a single set of such plates; plaintiff wished to own two cars and argued that the ADA entitled her, as a matter of law, to a set of disabled license plates for each car.

Defendants subsequently moved to dismiss the action, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that Wendel failed to state a claim under the ADA. By Memorandum and Order dated May 4, 2007 (the "May 4 Order"), the Court granted defendants' motion and held that Section 404-a was facially valid as a matter of law. The Court primarily based this ruling on the following: (1) although Section 404-a limits disabled drivers to a single set of disabled license plates, the statute does not preclude disabled drivers from obtaining – in

addition to the disabled license plates – the same number of regular license plates as non-disabled drivers; and (2) pursuant to Section 1203-a of the New York Vehicle and Traffic Law ("Section 1203-a"), Wendel is entitled – in addition to a set of disabled license plates, and as many regular license plates as a non-disabled driver – to a disabled "hang-tag" that is transferrable among all cars in which plaintiff rides. Further, after carefully reviewing Sections 404-a and 1203-a, the Court concluded that nothing on the face of these statutes suggested that hang-tags provide inferior benefits to disabled drivers in comparison to disabled license plates for purposes of parking. Thus, the Court held that Section 404-a did not facially violate the ADA as a matter of law.

Nevertheless, based upon certain factual representations Wendel made at oral argument, the Court afforded plaintiff leave to amend her complaint. In particular, the Court granted plaintiff leave to allege an ADA claim arising from defendants' application and/or implementation of New York's disabled license plate and hang-tag scheme. On July 3, 2007, plaintiff submitted her amended complaint. As the Court discusses in greater detail *infra*, Wendel primarily alleges in her amended complaint that New York's scheme violates the ADA because third parties – such as officers of the New York City Police Department (the "NYPD"), passing motorists, tow-truck operators, and gas station attendants – are less likely to recognize her disability and/or provide her assistance on the roads when her car merely bears a hang-tag (which cannot be used while the car is moving), and not disabled license plates.[1] Defendants now move to dismiss the amended complaint, pursuant to Rule 12(b)(6), on the grounds that Wendel has failed again to state a claim under the ADA.

For the reasons set forth below, the Court agrees with defendants and dismisses the amended complaint. The Court recognizes the serious difficulties that often confront disabled persons such as plaintiff in the performance of their daily activities, including driving, and Congress enacted the ADA to ensure that disabled persons are provided reasonable accommodations and protected from discrimination in the performance of such activities. Therefore, courts must carefully scrutinize any claim that a statute violates the ADA in any way. However, even if all of plaintiff's allegations are taken as true, New York's license plate and hang-tag scheme for disabled drivers does not, either on its face or as applied to plaintiff and her daily activities, violate the ADA. The current statutory and regulatory scheme in New York (including the use of hang-tags) provides plaintiff with full access to parking set aside for the disabled by law. Moreover, to the extent she alleges that the NYPD is improperly ticketing her vehicle even with a properly displayed hang-tag, her remedy is against the City of New York, not against New York State in an effort to strike down the license plate legislation. Similarly, to the extent she alleges that New York's license plate and hang-tag scheme deprives her of third-party benefits that are facilitated by the license plate as opposed to the hang-tag (including services of gas station attendants, tow truck operators, etc.), such alleged

---

[1] As the Court discusses *infra*, Wendel also continues to lodge a facial challenge to New York's disabled license plate and hang-tag scheme despite the Court's prior holding that this scheme was facially valid as a matter of law. The Court – in an abundance of caution – addresses plaintiff's renewed facial challenge below.

2

benefits are not within the purpose or province of the license plate/hang-tag framework and such framework need not be altered under the ADA in order to maximize these collateral third-party benefits allegedly obtained from the use of the disabled license plates. In fact, plaintiff has other practical and legal mechanisms available to her to ensure that these third parties are aware of her disability so that they can assist her while she is driving, whether such third party acts voluntarily or to comply with the ADA. Accordingly, as discussed below, plaintiff's ADA claim fails as a matter of law and cannot survive a motion to dismiss.

I. FACTS

The following facts are taken from Wendel's amended complaint (the "complaint") and are not findings of fact by the Court. The Court assumes these facts to be true for the purpose of deciding this motion and construes them in the light most favorable to plaintiff, the non-moving party.

A. Introduction

According to the complaint, Wendel resides in New York and has Spastic Diaplegic Cerebral Palsy, a "severe and permanent disability." (Compl. ¶ 1.) As a consequence of her disability, plaintiff uses either a wheelchair or elbow brace crutches. (Compl. ¶ 8, 11.)

The complaint states that Wendel is an attorney whose practice requires her to travel frequently to New York City from her home in Patchogue. (Compl. ¶ 10.) However, because of her disability, plaintiff "cannot effectively use public transportation." (Compl. ¶ 10.) Thus, Wendel "must own and use automobiles to maintain her livelihood." (Compl. ¶ 11.)

According to the complaint, Wendel lives alone and "has no relatives or other persons she can rely on to provide her with emergency transportation." (Compl. ¶ 12.)

B. Disabled Parking Permits, or "Hang-Tags"

The complaint states that, in 1995, Wendel applied for and received a New York City disabled person parking permit (a "parking permit" or "hang-tag"). (Compl. ¶ 23.)

(1) Purpose of Hang-Tags

According to a "Message from the New York State Department of Motor Vehicles," which sets forth the procedural and substantive requirements both for disabled parking permits and disabled license plates (the "DMV Requirements"),[2] the "proper use" of a hang-tag is to use parking spaces set aside for the disabled. (Compl. at Exh. A.)

(2) Characteristics of Hang-Tags

As the DMV Requirements explain, hang-tags "may be used in any vehicle in which [a disabled person] is riding" and, therefore, may be used in more than one vehicle. (Compl. at Exh. A.)

According to plaintiff, "[t]he parking permits are designed to be hung from rear view mirrors of motor vehicles when the vehicle is parked. The permits can block an

---

[2] As set forth *infra*, the Court may consider the DMV Requirements for purposes of the instant motion to dismiss because the DMV Requirements were appended to the complaint.

3

operator's view of the road when driving and so are not permitted to be affixed to a rear view mirror while the vehicle is moving. These permits are approximately two inches by six inches and are not reflective." (Compl. ¶ 17.)

C. Disabled License Plates

The complaint states that, approximately in or about 2002, Wendel applied for and obtained a set of disabled license plates. (Compl. ¶ 31.)

(1) Purpose of Disabled License Plates

According to the DMV Requirements, the "proper use" of the disabled license plate is – as with the hang-tag – to use parking spaces set aside for the disabled. (Compl. at Exh. A.)

(2) Characteristics of Disabled License Plates

In contrast to the hang-tags – which, as stated *supra*, may be transferred to any vehicle in which a disabled person travels – disabled persons are permitted to obtain only one set of disabled license plates. (Compl. ¶ 43, Exh. A.)

Further, according to Wendel, disabled license plates are approximately six inches by twelve inches and are reflective. (Compl. ¶ 14.) In addition, disabled license plates "are easily seen in daylight or at night and provide essential identifying information about the vehicle and its owner(s) while the vehicles are moving or stationary." (Compl. ¶ 14.)

(3) Wendel's Experience With Disabled License Plates

In the complaint, Wendel alleges certain "benefits from use of disabled person license plates that she was not able to receive from use of the" hang-tag. (Compl. ¶ 32.) Specifically, plaintiff alleges the following benefits, all of which are related to third parties: (1) The disabled license plate facilitates her ability to "obtain[] the assistance of gasoline station attendants to help the plaintiff fill up her gas tank at self-serve pumps and in paying for gasoline" because she no longer needs to honk her horn to get the attendants' attention (Compl. ¶¶ 33, 34); (2) If plaintiff becomes ill while driving or her car breaks down, "[p]assing motorists, police officers and tow truck operators are much more likely to pull over and offer the plaintiff assistance." (Compl. ¶ 35.) Specifically, these parties "can see at a glance that she is disabled if her vehicle has disable[d] person license plates," while hang-tags are "visible, at best, from the rear-view mirror of a passing motorist" and, "[i]n a situation of illness, the plaintiff may not even have the strength to take [the] permit out and place it on her rear-view mirror" (Compl. ¶ 35);[3] (3) Plaintiff received "far fewer" parking tickets with the disabled license plate than with the hang-tag because "New York City parking enforcement employees". . . did not see the hang-tag, or did not see the hang-tag until they already started writing the ticket" (Compl. ¶¶ 25, 26; 31); (4) After the attacks on September 11, 2001, her hang-tag did not

---

[3] In addition, plaintiff alleges certain practical and administrative difficulties she has experienced with the hang-tag, such as – among other things – that she once forgot to remove the hang-tag from her rear-view mirror and the hang-tag flew out the window. (Compl. ¶ 24.)

4

enable her to use bridges, tunnels, and roads restricted to, *inter alia*, disabled persons because security officials "often failed to see the permit and/or failed to accord the plaintiff the benefit this permit was supposed to confer upon her," but plaintiff was able to use those roadways with disabled license plates (Compl. ¶¶ 28, 29, 31).[4]

### D. Wendel's Desire to Own Two Automobiles and, Thus, Two Sets of Disabled License Plates

According to the complaint, Wendel has "found it optimal to own two automobiles" – specifically, a small car and a lift-equipped van – for the following reasons: (1) she has an alternative vehicle if one of her vehicles breaks down; and (2) she needs a van for trips on which she brings her wheelchair, but only needs a small car on the days that she uses her crutches. (Compl. ¶ 11.)

Thus, Wendel alleges, she applied for an additional set of disabled license plates for use in her second automobile. (Compl. ¶ 43.) However, because of the policy precluding disabled persons from obtaining more than one set of disabled license plates, plaintiff's request was denied. (Compl. ¶ 32.)

The complaint states that – as a result of Wendel's inability to obtain a second set of disabled license plates – she sold her smaller car and kept the van, even though the smaller car "was more economical on gas and repairs." (Compl. ¶ 44.)

### E. Relief Requested

According to the complaint, "defendants' policy to deny drivers with disabilities the right to obtain more than one disab[led] license plate . . . violates the ADA rights of the plaintiff and of other similarly situated severely disabled New York State motorists because it has a discriminatory effect on their ability to use the public highways and of other highway facilities such as parking spaces." (Compl. ¶ 45.) Thus, Wendel asks for declaratory and injunctive relief, including modification of "defendants [sic] disabled person license plate program to permit the plaintiff to obtain a second set of disabled person license plates." (Compl. ¶ 51.)

## II. PROCEDURAL HISTORY

As stated *supra*, Wendel filed the original complaint in this action on September 12, 2006. As the Court also stated *supra*, the Court dismissed this complaint by Memorandum and Order dated May 4, 2007. On July 3, 2007, plaintiff submitted her amended complaint. On September 28, 2007, defendants submitted the instant motion. Wendel submitted her response on January 10, 2008, and defendants submitted their reply on February 11, 2008. The Court held oral argument on March 7, 2008.

---

[4] Plaintiff also posits a potential future benefit of her disabled license plate – again, from a third party. Specifically, she alleges that "[i]t is reasonable to expect that in the future there will be traffic congestion restrictions, security restrictions and/or monetary penalties for use of the public highways in and around New York City that will not apply to persons who possess disabled person license plates." (Compl. ¶ 10.) Plaintiff bases this expectation on the terms of the Congestion Pricing Bill previously considered by the New York State Senate, which exempted drivers with disabled license plates from certain penalties for driving on Manhattan roadways. (Compl. ¶ 36.)

5

## III. STANDARD OF REVIEW

In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). The plaintiff must satisfy "a flexible 'plausibility' standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007). The Court does not, therefore, require "heightened fact pleading of specifics, but only enough facts to state a claim for relief that is plausible on its face." *Id.* at 1974.

Further, in reviewing a motion to dismiss, "the district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Nevertheless, "documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Id.* Here, therefore, in addition to the complaint, the Court will consider the two exhibits appended thereto, including – as described *supra* – the DMV Requirements.[5]

In addition, although Wendel has not explicitly asked the Court to take judicial notice of any other documents, she appended an affidavit to her opposition papers. However, plaintiff did not attach this affidavit to the complaint, or refer to it therein.[6] Thus, the Court will not consider the affidavit on the instant motion. Nevertheless, in an abundance of caution, the Court has carefully reviewed the affidavit (to determine whether additional leave to re-plead should be given to include facts contained in the affidavit) and finds that it merely amplifies the allegations already contained in the complaint. Therefore, the affidavit does not contain any allegations that would alter the Court's legal analysis below and any further amendment of the complaint would be futile.

## IV. STATUTORY BACKGROUND

Set forth below are the federal and state statutes relevant to the Court's analysis of New York's disabled license plate and hang-tag system.

---

[5] The Court notes that plaintiff did not provide the Court with the other exhibit – a brochure about transportation from the Metropolitan Transportation Authority – until July 23, 2007, twenty days after filing the complaint. In any event, because plaintiff filed the brochure as an exhibit to the complaint, the Court will consider the brochure in conjunction with the instant motion.

[6] The Court is aware that the Second Circuit has also held that courts may take judicial notice of documents filed in other courts not for "the truth of the matters asserted in other litigation, but rather to establish the fact of such litigation and related filings.'" *Crews v. County of Nassau*, No. 06-CV-2610 (JFB), 2007 U.S. Dist. LEXIS 6572, at *5 n.2 (E.D.N.Y. Jan. 30, 2007) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). Wendel's affidavit, however, clearly does not fall within this exception.

## A. Federal Law

(1) The ADA and its Enacting Regulations

In 1990, Congress enacted the ADA in order "to 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003), *cert. denied* 541 U.S. 936 (2004), (quoting 42 U.S.C. § 12101(b)(1)). Specifically, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Further, pursuant to the ADA, the Department of Justice has promulgated certain regulations in Title 28, Part 35 of the Code of Federal Regulations. Specifically, Part 35.130 states:

> (b)(1) A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability – . . . .
> (ii) Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
> (iii) Provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; . . . . [or]
> (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

28 C.F.R. §§ 35.130(b)(1)(i)-(ii), (vii).

Part 35.130 also contains the following provision related to licensing or certification programs:

> A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability.

28 C.F.R. § 35.130(b)(6).

Finally, Part 35.130 also states:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the

7

> public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

(2) Subsequent Federal Regulations Pertaining Specifically to Disabled Drivers

In 1991, the National Highway Traffic Safety Administration and the Federal Highway Administration enacted two regulations relating to disabled license plates and hang-tags. The first such regulation, entitled "Special license plates," states:

> Upon application of a person with a disability which limits or impairs the ability to walk, each State shall issue special license plates for the vehicle which is registered in the applicant's name. . . . The issuance of a special license plate shall not preclude the issuance of a removable windshield placard.

23 C.F.R. § 1235.3.

The second such regulation, entitled "Removable windshield placards," states:

> The State system shall provide for the issuance and periodic renewal of a removable windshield placard, upon the application of a person with a disability which limits or impairs the ability to walk. The State system shall require that the issuing authority shall, upon request, issue one additional placard to applicants who do not have special license plates. . . . The State system shall require that the removable windshield placard is displayed in such a manner that it may be viewed from the front and rear of the vehicle by hanging it from the front windshield rearview mirror of a vehicle utilizing a parking space reserved for persons with disabilities.

23 C.F.R. § 1235.4.

B. New York's Statutory Scheme for Disabled Drivers

(1) Section 404-a and Related DMV Regulation

Section 404-a of New York's Vehicle and Traffic Law – the statute plaintiff challenges in the instant case – sets forth New York's rules for disabled license plates. In particular, Section 404-a states:

> It is the sense of the legislature to facilitate the usual and special uses of the highways and other motor vehicle facilities accorded to severely disabled residents of this state. The commissioner is hereby empowered to issue to such persons, upon their application, special motor vehicle registrations, and one set of vehicle identification plates for motor vehicles owned by such persons to be used for the transportation of

8

such severely disabled person
. . . .

N.Y. Veh. & Traf. Law § 404-a.

In addition, the DMV has promulgated a regulation pursuant to Section 404-a that identifies the statute's purpose. Specifically, Title 15, Chapter 1 of New York Codes, Rules, and Regulations states that Section 404-a "provides for the issuance of a motor vehicle registration and one set of distinctive vehicle registration number plates for motor vehicles owned by severely disabled persons, so that such motor vehicles may be parked in parking spaces designated for the handicapped by local authorities." 15 N.Y.C.R.R. § 24.1.

(2) Section 1203-a

Section 1203-a of New York's Vehicle and Traffic Law sets forth New York's rules for the dissemination of hang-tags. In particular, Section 1203-a provides that hang-tags "shall entitle any vehicle displaying such permit to park in any area in any city, town or village of the state which has been designated . . . as a place for parking for persons with disabilities."

N.Y. Veh. & Traf. Law § 1203-a.

V. DISCUSSION

A. Plaintiff's Continued Objection to Statute's Facial Validity

As noted above and as the Court observed during oral argument, Wendel continues to question – albeit on new grounds – the facial validity of Section 404-a, despite the Court's holding in the May 4 Order that the statute does not facially violate the ADA as a matter of law. As set forth below, the Court – in an abundance of caution – has considered Wendel's new argument and finds it without merit.

(1) Background

In rejecting Wendel's facial attack on Section 404-a in the May 4 Order, the Court specifically held, *inter alia*:

> [A]lthough Section 404-a limits the number of special plates available to disabled drivers, New York law enables such individuals to identify themselves as disabled drivers and, in turn to enjoy special parking privileges even when using vehicles that do not have special plates. Specifically, [Section 1203-a] allows disabled drivers to obtain a "special identification parking permit," also known as a "hang-tag," that, when placed in a vehicle not bearing special plates, indicates that the driver is disabled and "entitle[s]" the vehicle "to park in any area in any city, town or village of the state which has been designated . . . as a place for parking for persons with disabilities." Therefore, a disabled driver can obtain special plates for one vehicle *and* a hang-tag that can be used in any vehicle driven by the disabled person.

> Thus, the alleged facial deficiencies of Section 404-a – namely, that it prevents plaintiff from accessing public

9

roadways and facilities, and from owning and operating more than one vehicle – are refuted by Section 404-a itself and by Section 1203-a.

(May 4 Order at 3 (citation omitted) (emphasis in original)).[7] Essentially, the Court concluded that New York's disabled license plate and hang-tag scheme was facially valid because Sections 404-a and 1203-a together provide the disabled – including those with multiple cars – with equal access to parking. Thus, explicitly underlying the Court's analysis was the basic premise that disabled license plates and hang-tags are solely intended to provide disabled people with access to disabled parking spots.

However, in her new facial attack on Section 404-a, Wendel disputes this underlying premise. Specifically, Wendel argues that disabled license plates are meant not merely to facilitate parking, but also to facilitate use of the public highways. Thus, as plaintiff argues, to the extent that Section 404-a limits plaintiff's ability to obtain more than one set of disabled license plates, the statute also impermissibly limits her ability to access such highways. Plaintiff further asserts that Section 1203-a cannot effectively compensate for this limitation because Section 1203-a relates solely to parking. Therefore, she argues, Section 404-a facially violates the ADA. As set forth below, the Court disagrees.[8]

(2) The Language of Section 404-a

As a threshold matter, in arguing that Section 404-a encompasses more than parking, Wendel points to the statute's language:

> It is the sense of the legislature to facilitate the usual and special uses of the highways and other motor vehicle facilities accorded to severely disabled residents of this state.

N.Y. Veh. & Traf. Law § 404-a. Specifically, plaintiff points to the statute's reference to "highways," and asserts that this reference means that the legislature intended Section 404-a to provide benefits to the disabled apart from parking. However, the Court is unable to identify a single "usual and special use[] of the highways and other motor vehicle facilities *accorded to disabled residents of this state*" apart from disabled parking. N.Y. Veh. & Traf. Law § 404-a (emphasis added). In fact, in response to the Court's inquiry at oral argument, Wendel's counsel was similarly unable to point to any such additional "use[] of the highways" legally accorded to the disabled. The Court concludes, therefore, that the plain language of Section 404-a pertains to parking.

Moreover, as set forth below, the Court's interpretation of the language of Section 404-a is entirely consistent with the state and federal regulatory scheme described above with respect to disabled drivers, as well as the holdings of all courts that have addressed a

---

[7] As described *supra*, the Court also noted that the disabled are entitled to an unlimited number of regular license plates, in addition to the disabled plates.

[8] Presumably, Wendel now emphasizes access to the public highways because – as the Court describes *infra* – her as-applied challenge to Section 404-a largely relates to situations that take

place on such highways. As the Court also explains *infra*, such situations include the failure of passing motorists to stop and help plaintiff when her car breaks down.

state's disabled license plate and hang-tag scheme.

a. State and Federal Regulations

With respect to New York State, the DMV regulation described above – 15 N.Y.C.R.R. § 24.1 – explicitly states that disabled license plates are available to disabled drivers so that their "motor vehicles may be parked in parking spaces designated for the handicapped by local authorities." Thus, this regulation anticipates that disabled license plates will be used for parking purposes.

Similarly, the language of 23 C.F.R. §§ 1235.3 and 1235.4 – which, as also described above, regulate the states' provision of disabled license plates and hang-tags – suggests that disabled license plates and hang-tags share the same purpose: to facilitate parking for the disabled. In particular, although the regulations do not specify the purpose of disabled license plates, the regulations state that hang-tags are intended for the disabled to "utiliz[e] a parking space reserved for persons with disabilities." 23 C.F.R. § 1235.4. Further, the regulations explicitly provide that states may issue an additional hang-tag to "applicants who do not have special license plates." 23 C.F.R. § 1235.4. In combination with the regulations' stated intention for hang-tags, *i.e.,* parking, this provision for an additional hang-tag in lieu of a disabled license plate demonstrates that hang-tags and disabled license plates are — in the eyes of federal regulators – functionally interchangeable and, indeed, intended for parking.[9]

---

[9] Defendants also urge the Court to rely on Public Law 100-641, which mandates that the Secretary of Transportation "establish a uniform system for handicapped parking designed to enhance the safety of handicapped individuals" and "encourage adoption of such system by all the States." Specifically, Public Law 100-641 sets forth a scheme for disabled parking that anticipates the use both of disabled license plates and hang-tags. Thus, according to defendants, Public Law 100-641 evinced Congress' intention for disabled license plates and hang-tags to be used for parking. Defendants further argue that, because Public Law 100-641 was enacted two years prior to the ADA, but never repealed, the Court should analyze defendants' obligations under the ADA through the narrower prism of Public Law 100-641 and, therefore, conclude that New York's compliance with Public Law 100-641 – *i.e.,* the state's institution of a disabled license plate and hang-tag scheme – is sufficient to comply with the ADA. However, as several courts have recognized, "Public Law 100-641 is purely hortatory. Congress enacted Public Law 100-641 two years before the ADA and has no enforcement mechanism. . . . In contrast, the ADA expressly applies to the states through Congress' Fourteenth Amendment powers. . . ." *Dare v. California*, 191 F.3d 1167, 1172 (9th Cir. 1999), *cert. denied* 2001 U.S. LEXIS 1707 (Feb. 26, 2001); *see also Duprey*, 28 F. Supp. 2d at 711 (noting that Public Law 100-641 "merely [sets forth] guidelines for states to accept or reject as they choose"). Thus, although Public Law 100-641 provides key context for the federal and state statutory and regulatory framework underlying Section 404-a – and, thus, for New York's obligations thereunder – the Court will not rely on Public Law 100-641 to limit defendants' obligations under the ADA. In any event, as set forth *infra*, the Court need not rely on Public Law 100-641 in order to determine that New York's disabled license plate and hang-tag scheme complies with the ADA. In particular, the relevant federal and state statutes and regulations amply demonstrate that, because New York's disabled license plate and hang-tag scheme provides the disabled with equal access to parking, this scheme complies with the ADA.

b. Relevant Case Law

In addition, although it appears that no court has specifically addressed whether a state's provision of disabled license plates is meant to provide benefits to the disabled in addition to those related to parking, every court that has generally addressed disabled license plates – or indeed, that has addressed a state's disabled license plate and hang-tag scheme, in any legal context – has characterized their purpose or function solely in terms of parking, and not with respect to use of the roadways more broadly. *See, e.g., Klingler v. Director, Dep't. of Revenue*, 433 F.3d 1078, 1081 (8th Cir. 2006) (analyzing Missouri's disabled license plate and hang-tag scheme under ADA in order to determine whether Missouri could exact surcharge for hang-tags and characterizing scheme solely in terms of parking); *Neinast v. Texas*, 217 F.3d 275, 276 and n.3 (5th Cir. 2000), *cert. denied*, 2001 U.S. LEXIS 1713, (noting that, as with a hang-tag, a "handicapped symbol on a license plate also authorizes parking in handicapped spaces," without mentioning any other benefit of hang-tag or disabled license plate); *Dare*, 191 F.3d at 1172 ("The ADA requires special parking arrangements such as handicapped parking spaces. These spaces allow disabled people equal access to public buildings in which California provides services, programs, and activities. Because California polices handicapped parking spaces, disabled people need placards or license plates to use them. California thus meets the ADA's requirement for nondiscriminatory access to public buildings by providing disabled people with placards and license plates."); *Hexom v. Oregon Dep't. of Transp.*, 177 F.3d 1134, 1135 (9th Cir. 1999) ("Oregon has provided special parking places and privileges for disabled persons. It also has provided for the issuance of special license plates and of individual placards, which are portable and which can, therefore, be used on any car. The license plates and placards enable policing of parking space usage in order to assure that the spaces will not be used by persons who have no need for them."); *Duprey v. Connecticut*, 28 F. Supp. 2d 702, 703 (D. Conn. 1998) (noting that "[i]n Connecticut, a person with a disability impairing or limiting the ability to walk may apply for special license plates or a removable windshield placard to access parking spaces reserved for persons with disabilities"); *McGarry v. Director, Dep't. of Revenue*, 7 F. Supp. 2d 1022, 1027 n.6 (W.D. Mo. 1998) (noting that "in Missouri, the receipt of a disabled person license plate or placard avails the recipient of a broad range of rights and benefits" and explicitly identifying these rights and benefits as "exclusive and preferential parking spaces on public and private properties for recipients").[10]

In sum, the sole evidence to which Wendel points in favor of her over-broad interpretation of Section 404-a is the word "highway" in the statute. However – as the Court set forth above – plaintiff's interpretation is wholly belied by the plain language of the statute, as well as all of the relevant federal and state statutes, regulations, and case law. Thus, the Court maintains the underlying premise of the May 4 Order, *i.e.,* that disabled license plates and hang-tags are

---

[10] Further, as the Court described above, the DMV Requirements expressly anticipate that the disabled will use their disabled license plates and/or hang-tags for the purpose of parking. Specifically, according to the DMV Requirements, the "proper use" both of disabled license plates and hang-tags is to use parking spaces set aside for the disabled. (Compl. at Exh. A.)

both meant to facilitate parking.[11] Moreover, as the Court explained in the May 4 Order, because the scheme established in Sections 404-a and 1203-a provides the disabled with sufficient access to disabled parking spots – and because the disabled may obtain, in addition to a set of disabled license plates and a hang-tag, the same number of regular license plates as an individual without a disability – the scheme does not facially violate the ADA. The Court, therefore, again rejects plaintiff's facial challenge to Section 404-a.[12]

B. Wendel's As-Applied Challenge

As stated above, Wendel also lodges an as-applied challenge to Section 404-a. Specifically, Wendel alleges that by limiting the disabled to a single set of disabled license plates, Section 404-a – in practice – denies disabled people meaningful access to various benefits. However, the "benefits" plaintiff

---

[11] The Court, therefore, rejects Wendel's argument that hang-tags are inferior to disabled license plates because the former may only be used while a car is stopped; because the sole legal function of both hang-tags and disabled license plates relates to parking, the adequacy of either form of identification when a car is moving – for ADA purposes – is immaterial.

[12] The Court notes that, at oral argument, Wendel raised an additional attack on Section 404-a's facial validity that she did not include in her opposition papers. Specifically, plaintiff claimed that the reason defendants have provided for the statute's provision of only one set of license plates to the disabled – the prevention of fraud – lacks sufficient empirical justification. Although the parties did not brief this issue, the Court – in an abundance of caution – has considered it and, as set forth below, finds that Wendel's argument lacks merit. As a threshold matter, numerous courts – including those specifically analyzing states' disabled license plate and hang-tag schemes – have suggested that fraud prevention is a reasonable component of such schemes. *See, e.g., Dare*, 191 F.3d at 1169-70 ("California has a comprehensive priority parking program for qualifying disabled individuals and veterans. . . . To prevent abuse, California limits access to these privileges to vehicles displaying state-issued disability license plates or parking placards."); *McGarry*, 7 F. Supp. 2d at 1027 n.6 ("Clearly, in Missouri, the receipt of a disabled person license plate or placard avails the recipient of a broad range of rights and benefits. Missouri laws recognize exclusive and preferential parking spaces on public and private properties for recipients and provide screening mechanisms to curb abuse."). Moreover, the DMV has promulgated regulations providing that disabled drivers may obtain an additional set of disabled license plates if another member of their family is disabled and primarily drives the additional vehicle. *See* 15 N.Y.C. R.R. § 24.3. This regulation demonstrates that the DMV has tailored its disabled license plate and hang-tag scheme in order to provide adequate access to as many disabled individuals as possible without increasing the possibility of fraud or abuse. As the Second Circuit has held, "we will not second-guess Congress'[] judgment that the ADA was targeted to remedy and prevent *irrational* discrimination against people with disabilities." *Muller v. Costello*, 187 F.3d 298, 309 (2d Cir. 1999) (emphasis added). Under these circumstances, and in light of defendants' clear interest in preventing fraud, the Court cannot conclude that the limitations set forth in Section 404-a are irrational. *See, e.g., Lai v. N.Y. City Gov't*, 163 F.3d 729, 731 (2d Cir. 1998) ("It is not irrational to give the scarcest parking spaces to those who are severely handicapped and who live or conduct business in the City, while granting others, who are either less severely disabled or whose need for parking is less frequently pressing, access to parking that while still preferential, is not in as short supply."). In any event, as noted *supra,* the disabled license plate and hang-tag scheme does not in any way place disabled drivers at a disadvantage as compared to non-disabled drivers with respect to the ability to park, which is precisely what these laws are designed to address.

13

alleges in the complaint – including, *inter alia*, courtesies from third parties such as passing motorists and gas station attendants – bear no relationship to the legal entitlements Section 404-a provides. Thus, as set forth below, after carefully reviewing the complaint and drawing all reasonable inferences in plaintiff's favor, the Court rejects Wendel's as-applied challenge to Section 404-a pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

(1) Legal Standard

"[I]n order to establish a violation under the ADA, [a plaintiff] must demonstrate that (1) [she is a] qualified individual[] with a disability; (2) that the defendants are subject to the ADA; and (3) that [plaintiff was] denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or w[as] otherwise discriminated against by defendants, by reason of plaintiff['s] disabilit[y]." *Henrietta D.*, 331 F.3d at 272 (quotation marks omitted). Here, the first two prongs of this test are not in dispute. Moreover, although Wendel purports to raise an as-applied challenge to Section 404-a with respect to the third prong, she has not specified whether she is raising a claim of "intentional discrimination," "disparate impact," or "failure to make reasonable accommodation," all of which are potential theories under which a plaintiff may bring suit under the ADA. *See First Step, Inc. v. City of New London*, 247 F. Supp. 2d 135, 150 (D. Conn. 2003) (noting availability of three theories to ADA plaintiffs).[13] However, the Court has surmised, based on plaintiff's repeated use of the word "access" in her opposition papers – as well as her passing citations to the case *Alexander v. Choate*, 469 U.S. 287 (1985) in the complaint and at oral argument – that plaintiff intends to lodge a reasonable accommodation claim. The Court, therefore, has reviewed the complaint according to the standard established by the Second Circuit for such claims.[14]

In particular, as the Second Circuit recognized in *Henrietta D.*,

> Our analysis of the requirements of a reasonable accommodation claim begins with the Supreme Court's opinion in *Choate*. There . . . the Court suggested that the relevant inquiry asks not whether the benefits available to persons with disabilities and to others are actually equal, but whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled. *See Choate*, 469 U.S. at 301. The Court explained that 'an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. . . . To assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.

---

[13] Indeed, Wendel's opposition papers cite but a single case relating to the ADA, and that case pertains to the applicability of Title II of the ADA to prison inmates. (Pl.'s Opp. at 13.)

[14] The Court notes that, even if the claim were treated as an "intentional discrimination" or "disparate impact" claim, such claims would also fail as a matter of law for, among other things, the reasons discussed *infra*.

14

331 F.3d at 273. The Second Circuit explained, therefore, that "the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to sustain a claim for a reasonable accommodation." *Id.* at 276-77; *see also LeFebvre v. Astrue*, No. 1:05-CV-255, 2008 U.S. Dist. LEXIS 15302, at *21-*22 (D. Vt. Feb. 28, 2008) ("The Second Circuit has defined 'reasonable accommodation' as 'one that gives the otherwise qualified plaintiff with disabilities "meaningful access" to the program or services sought.'") (quoting *Henrietta D.*, 331 F.3d at 282).

The Second Circuit further articulated in *Henrietta D.* "what is meant by 'meaningful access to the benefit that the grantee offers,'" *id.* at 277 (quoting *Choate*, 469 U.S. at 301), emphasizing that the ADA "plainly define[s] benefits by reference to a plaintiff's facial legal entitlements." *Id.* In other words, in determining whether a plaintiff has been denied meaningful access to benefits, a court must consider the benefits to which a plaintiff is legally entitled. However, as the Supreme Court cautioned in *Choate*, "[t]he benefit itself . . . cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." 469 U.S. at 301.

Applying these principles, the Second Circuit in *Wright v. Giuliani* specifically elaborated on the definition of "benefits" in the context of a *Choate* reasonable accommodation claim. Specifically, the Second Circuit explained that "[i]n a string of recent decisions brought under the disabilities statutes at issue here [*i.e.,* the Rehabilitation Act and the ADA], this Circuit has . . . distinguished between (1) making reasonable accommodations to assure access to an existing program and (ii) providing additional or different substantive benefits." 230 F.3d 543, 548 (2d Cir. 2000) (collecting cases). Specifically, the *Wright* Court explained that "the thrust [of that authority] is that the disabilities statutes do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be. They require only that covered entities make 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not." *Id.*; *see also Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998) (affirming district court's grant of summary judgment to defendant because "central purpose of the ADA . . . is to assure that disabled individuals receive evenhanded treatment in relation to the able-bodied" and "what Doe ultimately seeks to challenge is not illegal discrimination against the disabled, but the substance of the services provided to him. . . . To provide the modifications he seeks would not serve the purpose of leveling the playing field. . . .") (citation and quotation marks omitted); *Zahran v. N.Y. Dept. of Educ.*, 306 F. Supp. 2d 204, 213 (N.D.N.Y. 2004) ("In other words, while reasonable accommodations must be offered to ensure meaningful access to the program, the statutes do not require that substantial changes be made to the program itself.") (citing *J.D. ex rel J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir. 2000)); *Leocata v. Wilson-Coker*, 343 F. Supp. 2d 144, 155-56 (D. Conn. 2004), *aff'd* 2005 U.S. App. LEXIS 19730 (2d Cir. Sept. 13, 2005) ("The ADA does not require . . . that disabled persons be accommodated with new varieties of public benefits currently unavailable to anyone: 'Even [when] plaintiffs have demonstrated that they are entitled to a

reasonable accommodation, an accommodation that served as a grant of special substantive rights would not constitute appropriate relief.' If a program's public services or benefits are available to all qualified individuals on an equal basis, no ADA claim stands: 'The ADA requires only that a particular service provided to some not be denied to disabled people.' It does not 'establish an obligation to meet a disabled person's particular needs. . . .'") (citations omitted) (quoting *Henrietta D.*, 331 F.3d at 282, *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999), *cert. denied* 531 U.S. 864 (2000), and *Doe*, 148 F.3d at 83); *Galusha v. N.Y. Dep't of Envtl. Conservation*, 27 F. Supp. 2d 117, 123 (N.D.N.Y. 1998) (noting that in *Choate*, the "Supreme Court struck [a] balance by requiring that persons with disabilities be provided meaningful access through reasonable accommodations to publically funded benefits or programs without otherwise fundamentally or substantially altering the underlying benefit or program") (citation and quotation marks omitted); *see generally Am. Council of the Blind v. Paulson*, No. 07-5063, 2008 U.S. App. LEXIS 10711, at *28-*29 (D.C. Cir. May 20, 2008) ("Although the cases addressing meaningful access are necessarily fact-specific, they do reflect, in light of Supreme Court guidance, a general pattern: Where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit. By contrast, where the plaintiffs seek to expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access.").

(2) Application

Here, Section 404-a entitles plaintiff to only a single set of disabled license plates. However, New York has also provided plaintiff with a hang-tag transferrable among any car in which she drives so that, when such a car does not bear disabled license plates, plaintiff may still park in a disabled parking spot. Nevertheless, plaintiff claims that New York's disabled license plate and hang-tag scheme – as applied – violates the ADA by depriving plaintiff meaningful access to a variety of benefits. However, pursuant to the Second Circuit's standard for reasonable accommodation claims, set forth above, the Court has determined that plaintiff cannot – as a matter of law – obtain the relief she seeks by means of the instant lawsuit.

Specifically, plaintiff alleges that, when her car bears merely a hang-tag, she is deprived of benefits such as the assistance of gasoline station attendants to help plaintiff fill her gas tank at self-serve pumps and pay for gasoline, and the assistance of passing motorists, police officers, and tow truck operators if plaintiff becomes ill while driving or if her car breaks down. Specifically, plaintiff contends that she is deprived of such benefits because the hang-tags are less visible to these third parties than the disabled license plates, and may only be used when her car is stopped.[15] Plaintiff also claims that when her car bears merely a hang-tag, New York City police officers are more likely to give her parking tickets and to prevent her from traveling on roadways upon which the disabled may drive. In addition, Wendel

---

[15] As the Court explained *supra*, however, the sole legal function of both hang-tags and disabled license plates relates to parking and, therefore, the utility of either form of identification when a car is moving is immaterial.

expresses concern that legislators, in the future, may pass legislation related to traffic congestion which, when applied in practice, will deny benefits to disabled drivers that do not possess disabled license plates.[16]

As a threshold matter, the Court wholly rejects Wendel's assertion that the ADA entitles her to assistance from passing motorists. The Second Circuit has confirmed that "legislation such as the ADA cannot regulate individuals' conduct so as to ensure that they will never be rude or insensitive to persons with disabilities." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008). (citation and quotation marks omitted); *see, e.g., Stephens v. Shuttle Assocs., L.L.C.*, 547 F. Supp. 2d 269, 278 (S.D.N.Y. 2008) (dismissing ADA claim pursuant to *Camarillo* in instance where, "[a]rguably, [defendant's] conduct may have been rude or insensitive"). Certainly, therefore, the ADA is not meant to prevent the potential discourtesies of passing motorists. Accordingly, Section 404-a, as a matter of law, cannot violate the ADA simply based on its alleged failure to facilitate such courtesies because it does not allow disabled people to obtain more than one set of disabled license plates.[17]

With respect to the various other third-party entities listed by plaintiff, the Court does not dispute that the ADA prohibits discrimination of the disabled by those individuals and also requires that reasonable accommodations be made. For example, the Court is aware that the ADA entitles plaintiff to meaningful access to places of public accommodation, and that such places include, *inter alia*, gas stations. *See, e.g., Aquino v. Prudential Life and Casualty Ins. Co.*, 419 F. Supp. 2d 259, 267-68 (E.D.N.Y. 2005) (listing categories of private entities subject to the ADA, including gas stations). In addition, it is beyond cavil that New York City police officers cannot issue parking tickets to the disabled if they properly display the hang-tag in the windshield and park their vehicle in an area that allows for such parking.

However, as the Court held *supra*, the sole "facial legal entitlement" provided by Section 404-a is access to disabled parking. Section 404-a does not purport to regulate the conduct of gas station attendants, New York City police officers, or tow-truck operators. To the extent that these third-party entities are allegedly failing to comply with the ADA, Wendel's proper recourse is to bring suit against these entities – not against New York State and the other related defendants.[18]

---

[16] As the Court emphasized at oral argument, the Court assumes for purposes of this motion that all of the facts Wendel alleges – including all of the facts and concerns she alleges with respect to third parties – are true, and draws all reasonable inferences from these facts in plaintiff's favor.

[17] The Court similarly rejects any speculative arguments by plaintiff regarding how any future congestion pricing legislation in New York City may result in discriminatory treatment of disabled drivers because of the license plate and hang-tag scheme currently in existence under New York's Vehicle and Traffic Law. There is no legal basis to raise such a claim based upon the speculative

impact of some future legislation.

[18] In *Camarillo*, for instance, the Second Circuit upheld a reasonable accommodation claim where a legally-blind plaintiff alleged that a restaurant failed to provide meaningful access under the ADA by failing to provide large-print menus and by subjecting the plaintiff to ridicule because she was unable to read the smaller print. 518 F.3d at 158. The Second Circuit explained that Camarillo's claim was valid because "a reasonable inference to be drawn from her complaint is that defendants failed to adopt policies or procedures to effectively train their employees how to deal

Despite Wendel's over-broad interpretation of Section 404-a, the ADA renders New York State and the other named defendants no more liable for the training of New York City police officers than for the unfortunate discourtesies of passing motorists. *See Dinapoli v. City of New York*, No. 05 Civ. 10879, 2008 U.S. Dist. LEXIS 49550, at *7 (S.D.N.Y. June 30, 2008) ("The City made reasonable accommodations for DiNapoli, given his disability and that he is able to drive and use a car service: it held the hearing in a wheelchair-accessible facility, and it offered to reschedule the hearing to accommodate DiNapoli's transportation difficulties. Moreover, DiNapoli's requests that the NYPD appoint counsel for him or conduct the hearing by phone or mail would have created a substantively different appellate hearing than is offered to others."); *Jaramillo v. Prof'l Examination Serv.*, 544 F. Supp. 2d 126, 131 (D. Conn. 2008) ("[S]everal courts have made clear that . . . [the ADA] require[s] only reasonable accommodations, not necessarily the particular accommodations an individual would prefer.") (collecting cases); *Resnick v. 392 Central Park W. Condominium*, No. 07 Civ. 1988, 2007 U.S. Dist. LEXIS 60232, at *6 (S.D.N.Y. Aug. 14, 2007) ("Plaintiff has meaningful access to all parts of the parking lot from the 100th street entrance. An alternative route around the speed bump to the public street is a reasonable accommodation. Defendants need not adopt plaintiff's preferred means of accommodation – replacing the speed bump at the 97th street entrance with a short arm automatic gate – when they have already provided a reasonable accommodation in the form of an alternative route through the 100th street entrance."); *Zahran*, 306 F. Supp. 2d at 213 (dismissing reasonable accommodation claim brought under Rehabilitation Act because "[p]laintiffs with disabled individuals." *Id*. at 157.

would be hard-pressed to argue Ibrahim was denied meaningful access to a federally funded program. Indeed, their challenge is more related to the substantive contours of what would comprise the program as applied. . . .").

In essence, Wendel is attempting to portray a challenge to the scope of Section 404-a as a reasonable accommodation claim, but the ADA does not permit plaintiff to "expand the substantive scope" of the statute in this manner. There is no legal basis for plaintiff to transform Section 404-a, which is designed to facilitate parking for the disabled, into a statute that purportedly runs afoul of the ADA if it does not adequately address every situation that may confront a disabled driver on the road with respect to any third parties– whether they be other motorists, tow truck drivers, or gas station attendants. Nothing in the language of the ADA, or Supreme Court or Second Circuit jurisprudence defining the scope of the ADA, requires such a result.[19]

---

[19] As the Court noted at oral argument, if it was further alleged and proven that the current size of disabled license plates did not allow for all of these third parties (tow truck operators, gas station attendants, passing motorists, etc.) to adequately see the disabled plates from various distances, the logic of plaintiff's legal position would then require the State to issue much larger license plates in order to comply with the ADA. Counsel for plaintiffs agreed that, in such a hypothetical situation, plaintiff would take the position that the ADA would require such relief. Although not specifically discussed at oral argument, car manufacturers would then also presumably be required to manufacture cars in a manner that could accommodate such larger plates. Counsel's assertion that such a result would be required in this hypothetical is premised on an erroneous legal assumption – namely, that Section 404-a and the license plate/hang-tag framework must effectively guarantee these collateral third-party benefits,

18

Plaintiff has legal remedies available to her to ensure that these third-party entities do not discriminate against her, and provide reasonable accommodations to her, under the ADA. Similarly, to the extent that plaintiff wishes on her own to make the fact that she is a disabled driver more visible to all third parties (including passing motorists) so they can be courteous and provide other services to her, nothing in Section 404-a or the New York's Vehicle and Traffic Laws prevents her from doing so.[20]

In sum, because the license plate and hang-tag scheme established in New York's Vehicle and Traffic Law does not violate the ADA on its face or as applied to plaintiff, plaintiff's amended complaint fails to state a claim as a matter of law.[21]

## VI. CONCLUSION

For the foregoing reasons, the Court agrees with defendants that the complaint fails – as a matter of law – to demonstrate that Section 404-a violates the ADA facially or as applied to plaintiff. The Court, therefore, dismisses the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 23, 2008
Central Islip, NY

\* \* \*

The attorney for plaintiff is Martin J. Coleman, Esq., 110 Marcus Blvd., Suite 300, Hauppauge, New York 11788. The attorney for defendants is Andrew M. Cuomo, Esq., Attorney General of the State of New York, by Susan M. Connolly, Esq., Assistant Attorney General, 300 Motor Parkway, Suite 205, Hauppauge, New York 11788.

---

which are allegedly obtained from the disabled license plates, in order to comply with the ADA. As discussed above, the Court disagrees with plaintiff's fundamental legal position and concludes that Section 404-a does not violate the ADA because of its failure to address these third-party situations.

[20] For example, the Court is unaware of any law that would prevent plaintiff from displaying a decal or insignia of any kind or size in the area around her license plate (or other area of the car) which would be visible at long distances and would indicate to third parties that a disabled person is driving in the vehicle. When the Court asked Wendel's counsel at oral argument why, if plaintiff wishes to catch the attention of such motorists, she could not utilize such an approach, counsel suggested without explanation that such a remedy would be logistically difficult.

[21] The Court has considered whether allowing plaintiff leave to re-plead again is warranted. However, it is clear to the Court – from the initial complaint, the amended complaint, and the two rounds of briefing on the defendants' motion to dismiss, as well as the two oral arguments regarding such motions – that any further leave to re-plead (which has not even been requested by plaintiff) would be futile. The legal defects discussed in this Memorandum and Order cannot be cured by providing any additional details or allegations regarding plaintiff's claims.